**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

MICHAEL ANTONIO LIVINGSTON,          :
AIS 229189,

                                     :

        Petitioner,

                                     :        CA 17-0106-KD-MU

WILLIAM STREETER,                    :

        Respondent.

**SUPPLEMENTAL REPORT AND RECOMMENDATION**

Michael Antonio Livingston, a state prisoner presently in the custody of the respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254.  (Doc. 1). This matter has been referred to the undersigned for the entry of a supplemental report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72, and General Local Rule 72(a)(2)(R). It is recommended that the instant petition be dismissed as time barred under the Anti-Terrorism and Effective Death Penalty Act's one-year limitations provision contained in 28 U.S.C. § 2244(d).[1] Alternatively, it is recommended that the Court find that it is procedurally barred from reaching the merits of the claims raised by Livingston herein.

---

[1]     On March 20, 2017, the undersigned recommended that Livingston's § 2254 habeas corpus petition be dismissed as time-barred. (Doc. 4.) By Order dated May 1, 2017, the Court declined to adopt the undersigned's report and recommendation and, instead, held "it in abeyance pending [Respondent's] response." (Doc. 9, at 1.) Accordingly, through this supplemental report and recommendation, the undersigned reiterates that Livingston's habeas corpus petition is due to be dismissed as time-barred and, as well, recommends that this Court alternatively find that it is procedurally barred from reaching the merits of the claims Livingston seeks to present in his federal habeas corpus petition.

## FACTUAL BACKGROUND

On March 7, 2002, Cynthia Meinhardt, an LPN working for Saad's Health Care, went to the home of J.B. Livingston to provide home health care to the elderly Livingston, which included checking his blood pressure, pulse and temperature, listening to his chest and stomach, and checking the feeding tube in his stomach. (Doc. 12, Exhibit 1, T.T. 66-70 & 74-75). Meinhardt completed her nurse's note and called for Livingston's grandson, Michael Livingston, to sign the note. (*Id.* at 75; *see also id.* at 142 (Denise Warren's testimony that Meinhardt's March 7, 2002 clinical note on J.B. Livingston was signed off by Michael Livingston)). Meinhardt told Michael, who was wearing a white T-shirt and blue jeans, that if he had any problems or if his "mother"[2] needed to talk with her or anyone at Saad's to just give her a call. (*Id.* at 75.) Meinhardt had just gotten in her car and was turning around in the cul-de-sac when she received a call from Michael that his "mother" was on another house line and needed to talk to Meinhardt. (*Id.* at 76.) Meinhardt reentered the house, took the receiver from Michael, and said "hello" twice into the receiver before she was hit on the back of the head, fell to the floor, and was repeatedly stabbed by Michael Livingston. (*Id. at* 76-77). The victim knew Michael was her assailant based upon his voice, the clothes he was wearing, and the tattoo—"R.I.P. MLK"—on his left forearm. (*Compare id.* at 77 *with id.* at 71 (witness's initial description of the tattoo on Michael's left forearm)). Meinhardt managed to escape the attack and drive a few blocks to Faulkner Community College, where she called Saad's Health Care and her husband to inform them of the stabbing and await

---

[2]     Ivery Adams was Michael's aunt but she regarded Michael as another son. (*See* T.T. 429-30).

emergency assistance. (*Id.* at 78)[3]. During these telephone conversations, Meinhardt informed her Saad's co-employees and her husband that her patient's grandson stabbed her (T.T. 126),[4] testimony which was corroborated by her husband (T.T. 164-65 (Kevin Meinhardt's testimony that his wife told him during their cell phone conversation on March 7, 2002, at approximately 1:40, that her patient's grandson stabbed her)) and two of her Saad's co-employees (T.T. 143 & 161 (Denise Warren's testimony that she heard a portion of Meinhardt's call to Saad's over the speaker option, specifically Meinhardt's statement that she was stabbed by her patient's grandson); *see also* T.T. 168-69 & 172 (Bonnie Cochan's testimony that she fielded the call from Meinhardt on March 7, 2002 and hit the speaker option on the phone when Denise Warren walked into her office; the witness testified that Meinhardt told them that Mr. Livingston's grandson attacked her)). In addition, Prichard police detectives who questioned Meinhardt in the Faulkner Community College parking lot testified that the victim told them that her patient's grandson on Truman Street stabbed her. (T.T. 382 & 418). And, finally, Lieutenant Dorothy Ferrell Strother, the supervisor of the Criminal Investigation Division of the Prichard Police Department, and Agent Simon Benson of the Alabama Bureau of Investigation, testified that following an initial interview conducted with

---

[3]     A copy of Meinhardt's cell phone records reflect an attempt to call the operator at 1:40 p.m.; a 12-minute call to Saad's Health Care initiated at 1:41 p.m.; a 1:53 p.m. call to her home; and a 1:56 p.m. call to her husband. (*Id.* at 85-86.) One of the victim's co-employees at Saad's called 911. (*Id.* at 145; *compare id. with id.* at 118 (Meinhardt's cross-examination testimony that she did not call 911)).

Those phone records also reflect an incoming call at 1:31 p.m. from a 457 number that Meinhardt identified as coming from Michael, the caller identifying himself as Michael Livingston when Meinhardt answered her phone. (*Compare* T.T. 84-85 *with* T.T. 110-11.)

[4]     Meinhardt also made an in-court identification of Michael Livingston as being that person who attacked and stabbed her on March 7, 2002. (*Id.* at 127).

Meinhardt at the Mobile Infirmary while she was being prepped for surgery,[5] the investigators were summonsed back into Meinhardt's ER room and were informed by the victim that Michael Livingston was responsible for the attack (*id.* at 401 & 413) and that he was wearing a white T-shirt and blue jeans (*id.* at 401).[6]

Meinhardt was stabbed a total of ten times (T.T. 204). The two most severe injuries were a stab wound to the neck and a stab wound to the right back which punctured a lung and caused it to collapse partially (*see id.* at 200-02). The stab wound to the right back into the lung required a fairly strong degree of force to puncture all those layers and was life threatening given that a totally collapsed lung can cause death. (T.T. 203 & 206)[7]. Surgeons had to open up the neck wound more to see where the knife went and found that the knife punctured a major blood vessel. (*See id.* at 206).

Officer Willie Mabien was dispatched to the Truman Drive residence of J.B. Livingston very early in the investigation with instructions to detain Michael Livingston and transport him to the Prichard Police Department. (*See* T.T. 215-16 & 221-22). In addition, while Meinhardt was being treated at the hospital, law enforcement personnel were securing and searching the residence of J.B. Livingston. (*See* T.T. 347-59, 385 & 420). There was a lot of blood in the kitchen, more blood in the living room, down the

---

[5]    During this initial interview, Meinhardt told the investigators that as she was walking to her car Michael Livingston called her back for a phone call and, after picking up the phone in the kitchen, she was hit on the back of the head and thrown to the floor—the assailant saying "Bitch, I want you out of here"—and then the person, who had a mask on through which she could see his eyes, started stabbing her. (*Compare* T.T. 400-01 *with* T.T. 412.) Meinhardt said nothing about Michael Livingston during this first interview. (T.T. 405).

[6]    ABI Agent Charles Higgins testified that Meinhardt never told him that Michael Livingston was her assailant. (T.T. 264).

[7]    A chest tube was inserted into Meinhardt in order to re-expand the lung and allow it to heal. (T.T. 202).

hall and in the bathroom. (T.T. 384-85; *see also* T.T. 180-81 (Anna Hopper's testimony that there was blood "everywhere" in the kitchen)). A bloody, bent knife was discovered against the rear leg of the living room chair in which J.B. Livingston was sitting (T.T. 356-57)[8] and a white T-shirt with bloodstains was found crammed in a small space in the laundry room (T.T. 386).[9] A photograph of J.B. Livingston reflected blood on the back of the hands and left forearm and blood stains on his pajamas (T.T. 183, 186 & 373; *see also* T.T. 261 (ABI Agent Charles Higgins' testimony that J.B. Livingston had blood on the top of his hands)), and at least one witness saw blood in the palm of the elder Livingston's left palm. (T.T. 182 & 186). While J.B. Livingston's pajamas were recovered to test for the presence of blood (*see* T.T. 339-40), the lab was not given the elderly man's shoes/slippers. (T.T. 340-41).[10] Michael Livingston's blue jeans, boxers and socks were taken from him at the police station later that afternoon (*see* T.T. 396-97) and tested positive for the presence of blood (T.T. 336); also recovered from the defendant was a pair of white tennis shoes (*id.* at 397) that did not have blood on them (*id.* at 341).

While Livingston was at the Prichard Police Department on March 7, 2002, and after he had been Mirandized (T.T. 255-56 (testimony from Detective Robert Miller that

---

[8]     A partial latent print was found on this knife but there was not enough detail to be of value for comparison with the known prints of Michael Livingston and J.B. Livingston. (T.T. 342-43).

[9]     The laundry room could not be reached from inside the house; instead, getting access to the laundry room required going outside and around one side of the house to an outside door. (*See id.*).

[10]     According to J.B. Livingston's son and Michael Livingston's father, Michael Livingston, Sr., his father's shoes had blood on them. (T.T. 491; *but cf.* T.T.261 (Agent Higgins' testimony that there was no blood on J.B. Livingston's house shoes)).

he advised Livingston of his constitutional rights and that Livingston signed and executed the form waiving his *Miranda* rights)), he made a statement to ABI Agent Charles Higgins in which he specifically denied stabbing Meinhardt (*see id.* at 268-69 (Higgins testified that Livingston told him he was in the bathroom and heard his grandfather and Meinhardt arguing and then a gurgling sound, prompting him to run into the kitchen, slip on a large puddle of blood and fall face first on the floor, and while Meinhardt exited the door and his grandfather sat back on his chair in the living room, he picked up the bloody knife from the kitchen floor and took it to the bathroom to clear it and then cleaned blood from his grandfather's hands and called 911 to report the attack; Livingston told Higgins he cleaned the knife and hid his blood-soaked shirt because he was scared and was trying to protect his grandfather); *cf.* T.T. 461 (testimony of Michael Livingston's girlfriend, Marquita Lockhart, that she spoke with Michael at about 1:00 or 1:10 on March 7, 2002, and he told her in a "shaky" voice that there was blood all over the house and he was "wondering what was going on.")), instead blaming his grandfather for the attack (T.T. 290; *see also id.* at 179 & 181 (Anna Hopper's testimony that Michael initially told her that his grandfather had cut himself and an ambulance was on the way but later, when the speech pathologist asked J.B. Livingston where he had been cut, Michael Livingston said his grandfather had not been cut but, instead, had cut the nurse)).

Based upon the physical evidence at the scene, Michael Livingston's denial to Agent Higgins, the arguable conflicting nature of Meinhardt's identifications of her assailant, and medical record evidence (and testimony) of J.B. Livingston's history of physical aggression/violence and psychotic behavior, a robust defense was mounted by

Michael Livingston's trial attorney, Jeff Deen,[11] in an attempt to create reasonable doubt with respect to his client's guilt. To this end, the defense called attention to Meinhardt's testimony that she told police at the hospital about Michael's tattoo, voice and clothes (T.T. 89 & 122), which none of the investigators noted in their reports (*see, e.g.,* T.T. 282 & 285-86 (Higgins' report indicates that Meinhardt told him nothing about getting into her car and driving back or anything about a tattoo, the clothes worn by the assailant, the voice of the assailant or any name calling; instead, she simply told him she was attacked by a young black male wearing a mask); T.T. 404 (Lieutenant Ferrell Strother's testimony that during the first part of her interview with Meinhardt at the hospital, the victim mentioned nothing about her assailant's tattoos, clothing, or voice)), but was unable to recall telling them that someone struck her in the back of the head, threw her to the floor, started stabbing her and said, "Bitch, I want you to get out of here[]" and that her assailant was wearing a mask (*id.* at 121 & 123-24; *compare id. with* T.T. 160 (Denise Warren's cross-examination testimony that Meinhardt said nothing about tattoos, masks, T-shirts or voices during the telephone call she made to Saad's); 171-73 (Bonnie Cochran's cross-examination testimony that Meinhardt said nothing over the phone call about her attacker having tattoos or a mask or him saying "Fucking white bitch"); and *e.g.,* T.T. 400 (written report of Strother reflects that Meinhardt initially told the investigator that she was called back to the house by Michael before she reached her car for a phone call and that after speaking into the phone in the house she

---

[11]     In response to the trial court's July 19, 2002 discovery order (*see* Doc. 12, Exhibit 1, at 14-15), the State offered open discovery, opening its file to defense counsel on October 9, 2002 (*id.* at 16). Defense counsel also filed three motions seeking orders for the release of the medical records of J.B. Livingston from various medical facilities, all of which were granted by the court. (*See id.* at 20-27.)

was struck on the back of the head, thrown to the floor, and the assailant started stabbing her and said "Bitch, I want you out of here")).[12] In addition, Meinhardt admitted she had never had any problems with Michael (T.T. 106) and Anna Hopper, a speech therapist, who went to the Truman Drive residence of J.B. Livingston within minutes of the attack on Meinhardt (*see* T.T. 178 (Hopper arrived at the residence at 1:50 p.m.)) for an unannounced therapy session (*see id.* at 188), testified on cross-examination that Michael was very polite (*id.* at 193) and took no action to take her phone or prevent her from leaving the house (*id.* at 192 & 195). Defense counsel also established through testimony and treatment records, including those generated by Saad's, that on the morning of March 7, 2002, J.B. Livingston refused care (T.T. 153-54), a fact Meinhardt was unaware of (T.T. 108), that J.B. Livingston had a long history of aggression/violence/psychotic behavior toward caregivers and others (*see, e.g.,* T.T. 137, 139-40, 243-48, 295-96, 308-26, 431-34, 438-42 (testimony from Ivery Adams that her father, J.B. Livingston, physically abused her mother, was aggressive with nurses, and there were even times she had to run from him and, further, that her father had a long history of hospitalizations based on his psychotic and violent behaviors); T.T. 482-83 & 497 (Michael Livingston, Sr.'s testimony that his father would "wrestle" with him when he did not want to do something and that his father wrestled like a tough old man, not like a child)), that J.B. was quite agile, ambulatory, and capable of moving around (T.T. 435-37, 458-59, 468-70, 482, 484-85), that J.B. could free himself from restraints (T.T. 442-43), and that J.B. was certainly strong enough to pick up a book (T.T. 444 &

---

[12]      Defense counsel also got before the jury testimony that someone struck in the head, having lost a lot of blood, or on pain medications, might well be disoriented, unable to think clearly or unable to remember things. (*See, e.g.,* T.T. 159-60, 172, 210 & 414-15).

483 (Michael Livingston, Sr.'s testimony that his father was capable of picking up a book and even heavier items, including a hammer); *cf.* T.T. 467 & 470 (Joann Burrell's testimony that she had seen her uncle, J.B. Livingston, walk around his house carrying a knife one day during the two weeks in February of 2002 that she cared for him)).[13] Defense counsel then sought to contrast J.B. Livingston's violent tendencies/behaviors with Michael Livingston's reputation in the community as a peaceful, non-violent person. (T.T. 448, 459, 475, 477, 480 & 488; *but cf.* T.T. 450 & 475 (testimony of a few defense witnesses that their testimony regarding Michael's peaceable/non-violent reputation might change if they knew he had threatened to "kick" a neighbor's "ass" and burn down her daycare center)).

While certain defense witnesses saw J.B. Livingston as capable of attacking Meinhardt, consistent with Michael's statement to Agent Higgins, the State offered the opinion testimony of Dr. William Higgs, a cardiovascular surgeon, that a hypothetical 86-year-old with an ejection fraction of 19%, like J.B., would be physically incapable of moving from one room to another, strike a blow to the back of someone's head and stab that person 10 times with a knife (T.T. 236-38[14]; *see also* T.T. 299-300 (Dr. Zenia Zappher, a psychiatrist, testified that J.B. Livingston would not be physically capable of leaning over and striking someone with a knife multiple times)) and Zappher's further testimony that a hypothetical person like J.B. would not have the mental/cognitive

---

[13]     On cross-examination, Ivey Adams was asked whether she was telling the jury that her father could have attacked Meinhardt (T.T. 452), to which she gave the following response: "I don't know that he could have done it or not. I can only tell you what I've seen him do and how I've seen him act." (*Id.*)

[14]     Deen cross-examined Higgs at some length but could not get the surgeon to deviate in any manner from his expressed opinion. (*See* T.T. 239-51.)

capacity to move from room to room, obtain a weapon and carry out an attack involving 8 to10 blows (T.T. 300-01).[15]

A jury of Livingston's peers returned a verdict finding him guilty of the attempted murder of Cynthia Meinhardt (T.T. 559-60), clearly signaling that they found credible the testimony of the State's witnesses, particularly the eyewitness testimony of the victim. And as eruditely noted by Petitioner's own appellate counsel "[t]he evidence in the case clearly presented a jury question with regard to Livingston's innocence or guilt." (Doc. 12, Exhibit 3, at 20).

Immediately following the jury's verdict and the dismissal of the panel, but before the foreman of the jury departed the courthouse, the following occurred:

> THE COURT:  Okay. There was – everyone have a seat, please. Mr. Deen raised to the Court's attention, there was a concern from the family members of the defendant that a police officer was going into the jury room during the deliberation process. What occurred, Mr. Deen, is – and I'll be more than happy to listen to any testimony of anyone that you want to put on – it was brought to my attention by my secretary that there was someone at the door. When that was brought to my attention, I came into the courtroom. There was an officer by the door and I indicated that was not acceptable and the person, at that point, left. To my knowledge, if you want to put anyone on as far as anyone going inside the jury room, I'll be more than happy to listen to them.
>
> MR. DEEN:  Do you want to say anything?
>
> A SPECTATOR:    She went inside the jury room.
>
> THE COURT:    She went inside?
>
> A SPECTATOR:    She was inside. She came out. I seen her come out.

---

[15]      Deen cross-examined Zappher at even greater length (T.T. 303-27); however, the psychiatrist would not retreat from her opinion and, indeed, insisted that someone striking out physically with a part of the body (like a fist or a foot) is a motor action/reflex wholly distinct from that same person utilizing an instrument to strike blows (*see id.* at 327).

MR. DEEN:   I think you may want to ask the –

THE COURT:        Just a moment. Officer Pears, would you stop the foreperson of the jury and ask the foreperson to come in.

(Foreperson present.)

THE COURT:        I have just one question for you.

FOREPERSON:        Sure. Okay.

THE COURT:        And it's Mr. Sjolander[,] correct?

FOREPERSON:        Mr. Krist.

THE COURT:        Mr. Krist. I apologize. During the deliberation process, did anyone come in the jury room at all at any time?

FOREPERSON:        No, sir.

THE COURT:        Did anyone knock on the door or was there any disturbance or anything that was heard by anyone in the jury that you recall or from your personal recollection or did any of the jurors say anything?

FOREPERSON:        No, sir.

THE COURT:        But no one came in the jury room?

FOREPERSON:        No one came in, no one left.

THE COURT:        Thank you, sir.

.        .        .

THE COURT:        Mr. Deen, anything further on the issue of the jury?

MR. DEEN:   No, sir. I mean I wasn't here and I rely on Mr. Krist telling the Court.

THE COURT:        But I did come outside the courtroom as soon as that was brought to my attention and the person[] was outside the []room and they were requested to remove themselves from the door.

11

MR. DEEN:   Yes, sir. I have nothing further on that issue.

THE COURT:       Okay. And if the young lady who made the statement, if she wish to present anything further, I'll be more than happy to listen to her.

A SPECTATOR:       She did go inside that room. She did come outside that door. Me and her was sitting right outside. She was nowhere else in the courtroom.

THE COURT:       Well, ma'am, why did the other young lady indicate that she didn't see that, then?

A SPECTATOR:       I just saw her standing at the door.

THE COURT:       Okay. But the other young lady just stated that you and her both saw her go inside.

A SPECTATOR:       No, we didn't see her go [in]side. She – this lady right here in the black was standing at the door. [Sh]e was standing at the door. He was sitting back here. After she came out of the door, those were the only two standing –

THE COURT;       You're saying she went inside the jury room?

A SPECTATOR:       She had to because –

THE COURT:       No. No. Ma'am, I didn't ask you that.

A SPECTATOR:       No, I seen her come out of the door. I didn't see her go in.

THE COURT:       You saw her come out of the jury room?

A SPECTATOR:       Out of the jury room. And I can put that on my life, yes, she did.

MR. FURMAN:       Judge, I'll be glad, as an officer of the Court, I came in, Lieutenant Ferrell was hunched down below the level of the chairs listening at the door. Ms. Francez was standing there. I told them, I said, I don't believe y'all should be doing that, but she was definitely out of sight, but she was hunched down sitting at the bottom of the door and I saw that and I'll be glad to proffer that to the Court.

THE COURT:       Anything further, Mr. Deen?

12

MR. DEEN:   No, sir.

THE COURT:       The Court is satisfied, based upon the testimony of the foreperson of the jury, no one went in that jury room.

(T.T. 561-63 & 563-65.)

On May 9, 2003, Livingston was sentenced to life imprisonment. (Doc. 12, Exhibit 1, Sentencing Transcript, at 13)[16]. Defense counsel entered oral notice of appeal (*id.* at 14), after which the Court found Livingston indigent and appointed Glenn Davidson to represent him on appeal. (*Id.*)[17].

On December 10, 2003, appellate counsel filed a no-merit brief in accordance with *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and concurrently sought permission to withdraw as counsel of record for Livingston. (*See*

---

[16]     Six witnesses made favorable comments about Livingston during his sentencing hearing. (*See id.* at 4-9).

[17]     Interestingly, although Livingston was in the courtroom when the trial court announced that it was appointing Glen Davidson to represent him on appeal, he purports to have "just learned" of Davidson's appointment in a letter dated to appellate counsel on May 16, 2003. (*See* Doc. 8, Attached Letter to Davidson dated May 16, 2003.) Livingston advised Davidson in this letter that he wished to raise the following issues on appeal: "(1) Denied the Right to testify[;] (2) Detective sliding not[e] under the door of the Jury [room;] (3) so called victim changed her story 3 times[;] (4) never proper investigation of crime scene[;] (5) Cheryl Moore or any other doctors or nurses attacked by JB Livingston [should have been] called to testify[;] (6) I was never read my Miranda rights[;] (7) never gave any statement or signed anything but a false statement was used against me at trial[;] (8) my fingerprints were not on the weapon[;] (9) Blood was on JB Livingston's hands, feet[,] shoes yet he was never fingerprinted nor his clothing tested for blood[;] (10) medical records of JB Livingston kicking[,] punching[,] spitting and even saying he would kill and cut their throats [--] nurses and doctors[;] (11) Jeff Deen was ineffective[;] (12) Cynthia Meinhardt [should] take a lie detector test about changing her story 3 different times [a] mask [b] from behind [c] then one after talking with police[;] (13) inconsistent statements by police[;] (14) never a police report presented[;] (15) every person I picked on my jury (blacks) were dismissed for no reason[; 16] Saad's healthcare workers' reports from each time they came to treat JB Livingston[--] his behavior and violence[; 17] what's the proper procedure for investigating a crime scene? Did Prichard Police Department do this? What report was written[?]" (*Id.* at 1-2).

Doc. 12, Exhibit 3.) The following day, December 11, 2003, the Alabama Court of Criminal Appeals entered the following order, a copy of which was sent to Livingston:

> Counsel for the appellant in the above referenced cause **has filed a no-merit brief and a motion to withdraw as required by Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)**. Counsel has also advised this Court that **the appellant was served a copy of the no-merit brief and furnished with the appellant's copy of the record on appeal.**[18]
>
> Upon consideration of the above, the Court of Criminal Appeals hereby ORDERS as follows:
>
> The appellant shall have until January 1st 2004, to serve the appellant's counsel and this Court with a list of each and every point or issue the appellant wants considered in this appeal.
>
> If, by January 1st 2004, the appellant fails to identify any additional issues or points to be considered on appeal, the Court will then determine what action should be taken pursuant to Anders v. State of California, and will notify the appellee when and if a brief will be required.

(Doc. 12, Exhibit 4, ORDER (emphasis supplied; footnote added)). That Livingston received a copy of the appellate court's order is clear from his December 19, 2003 filing of a letter—the letter was dated December 17, 2003—advising that he wished to attack on appeal the trial court's denial of his motion for judgment of acquittal at the conclusion of the State's case-in-chief, arguing that the State failed to prove every element of the charged crime of attempted murder. (*See* Doc. 12, Exhibit 4A, at 2.) In addition, that letter from Livingston advised the appellate court that he consented to Davidson's

---

[18]     That the record on appeal would have, at the very least, included a copy of the trial transcript is clear inasmuch as the brief on appeal cites to the trial transcript as the record ("R"). (*See* Doc. 12, Exhibit 3, at 3-13.)

withdrawal and requested the appointment of new counsel to raise the foregoing issue.

(*Id.*)[19].

---

[19]     On the same day that Livingston sent a letter to the Alabama Court of Criminal Appeals concerning his direct appeal, that is, December 17, 2003 (*see* Doc. 12, Exhibit 4A), the Petitioner mailed to the Circuit Court of Mobile County, Alabama a Rule 32 petition (*see* Doc. 12, Exhibit 9A, at 8), therein raising the following issues which he claimed entitled him to relief: (1) the trial court was without jurisdiction to render the judgment or to impose sentence because the sentence imposed exceeded the maximum authorized by law or was not otherwise authorized by law; (2) the trial court was without subject matter jurisdiction over the matter in that the indictment was fatally defective because it failed to charge an offense; (3) ineffective assistance of trial counsel on account of his failure to properly object to hearsay evidence or rebut hearsay statements, his failure to submit a written jury instruction on assault, and his failure to properly represent Petitioner through all stages of the trial proceedings, including filing notice of appeal and failing to file a motion for a new trial; and (4) ineffective assistance of appellate counsel on account of appellate counsel's failure to request an extension of time to file a motion for a new trial until such time as the court reporter prepared the transcript and failure to raise by motion for new trial whether trial counsel was ineffective. (*See id.* at 9-10.) On December 23, 2003, the trial court entered a docket entry holding Livingston's Rule 32 petition in abeyance pending a decision by the Alabama Court of Criminal Appeals on his direct appeal, in accordance with *Barnes v. State,* 621 So.2d 329 (Ala.Crim.App. 1992). (*See* Doc. 12, Exhibit 2A, Docket Sheet Entry for December 23, 2003.) On February 5, 2004, the appellate court entered an order that essentially mirrors the order of the trial court. (*See* Doc. 12, Exhibit 6 ("The Court of Criminal Appeals has been notified that a Rule 32 petition has been filed with the circuit court in connection with the conviction that is currently pending in this Court on direct appeal in the above cause. On authority of Barnes v. state, 621 So.2d 329 (Ala.Crim.App. 1992), the Court of Criminal Appeals hereby ORDERS that all trial court proceedings in the pending Rule 32 petition shall be held in abeyance until otherwise ordered by this Court or until the certificate of judgment has been issued on the direct appeal.")).

The most important aspect of Livingston's December 17, 2003 Rule 32 petition, which is shown as having been docketed on December 23, 2003 (*see* Doc. 12, Exhibit 2A, at 7), is that it makes numerous references to specific portions of his trial transcript (*see, e.g.,* Doc. 12, Exhibit 9A, at 14-15 ("In the present case the State submitted into evidence a drawing (see) TR-73 at line 11 that states, 'MR. Deen, Judge, I assume she's gonna tie that up later with another witness, whoever drew it?' Ms. Francez states, 'I am Judge.' Mr. Deen States, 'That's fine[.] [I]f she's using it for illustration purposes, if somebody is going to say they drew it, I don't object to her showing it to the jury.[']"); *compare id. with* Doc. 12, Exhibit 1, T.T. 73 (same)). The importance of the Petitioner's citation to the trial transcript is that it establishes beyond any doubt that Livingston had a copy of the trial transcript in his possession when he filed his Rule 32 petition on (or about) December 17, 2003, undoubtedly a copy of which he received from his appellate counsel, along with a copy of appellate counsel's no-merit brief (*compare* Doc. 12, Exhibit 3, at 28 ("Undersigned counsel has forwarded the appellant's copy of the record on appeal to the appellant, together with a copy of this brief.") *with* Doc. 12, Exhibit 4, ORDER ("Counsel has also advised this Court that the appellant was served a copy of the no-merit brief and furnished with the appellant's copy of the record on appeal.")).

The Alabama Court of Criminal Appeals affirmed Livingston's conviction and sentence on February 20, 2004. *See Livingston v. State,* 910 So.2d 832 (Ala. Crim. App. Feb. 20, 2004) (table).

Michael A. Livingston was convicted of attempted murder, a violation of §§ 13A-6-2 and 13A-4-2, Ala. Code 1975. He was sentenced to life imprisonment.

On appeal, Livingston's appointed counsel has filed a "no-merit" brief in substantial compliance with Anders v. California, 386 U.S. 738 (1967), in which counsel states that he has thoroughly reviewed the record and can find no meritorious issues upon which to base an appeal. Livingston was afforded an opportunity to present pro se issues to his counsel and to this Court, and in a one-page statement filed with the Court, he claims that the trial court erred in denying his motion for a judgment of acquittal made at the close of the State's case because, he says, the State failed to "prove every element of the indictment for attempted murder."[20]

Section 13A-6-2(a)(1), Ala. Code 1975, provides that, "[a] person commits the crime of murder if . . . [w]ith intent to cause the death of another person, he causes the death of that person or of another person." Section 13A-4-2(a), Ala. Code 1975, provides that, "[a] person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense." In Chaney v. State, 417 So.2d 625 (Ala.Crim.App. 1982), this Court stated:

---

[20]     "Livingston also asks this Court to grant his attorney's motion to withdraw and to appoint new counsel on appeal to address the sufficiency issue. Livingston is only entitled to new counsel on appeal if this Court first finds that 'any of the legal points [are] arguable on the merits.' Anders, 386 U.S. at 744." (Doc. 12, Exhibit 7, at 2 n.1.)

In light of Livingston's clear direction to the Alabama Court of Criminal Appeals that it allow Davidson to withdraw, as well as the incontrovertible evidence of record that Livingston was in possession of a copy of his trial transcript (as well as a copy of the no-merit appellate brief) as of December 17, 2003, the undersigned deems apocryphal the highlighted contents of the letter Livingston allegedly penned to appellate counsel on February 25, 2004 (*see* Doc. 8, Attached Letter to Davidson dated February 25, 2004 ("I have received a letter from the Court of Appeals saying they have affirmed my conviction. How could this happen? When I wrote you and told you the issues I wanted to raise. These were good issues. *I haven't even received a brief from you. So I don't even know what you raised. . . . I have no records NO transcripts.*")).

> In formulating a general definition of what constitutes an attempt to murder the universally accepted guiding principle is that the fundamental elements of the crime of attempted murder are a specific intent to commit murder and an overt act in furtherance of that object. Anno. 54 A.L.R.3d 612, 617 (1973). In Alabama, a person commits the crime of attempt to murder if he intends to cause the death of another person and does any overt act towards the commission of that intent. Alabama Code 1975, Sections 14A-4-2 (the attempt statute) and 13A-6-2 (murder).
>
> The element of the overt act is clearly present in this case. The requisite actus reus need only be, indeed can only be, some deed short of consummation, e.g., falling short or wide of the goal. Huggins v. State, 41 Ala.App. 548, 550, 142 So.2d 915, cert. denied, 273 Ala. 708, 142 So.2d 918 (1962).

417 So.2d at 626-27.

In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all relevant evidence in a light most favorable to the prosecution. Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App. 1998)[.] . . . The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt. Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997)[.] . . . When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and in such a case, this court will not disturb the trial court's decision. Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998)[.] . . . The role of the appellate court is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury. Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).

In Ingram v. State, [Ms. CR-01-224, February 28, 2003] ___ So.2d (Ala.Crim.App. 2003), this Court stated:

> When reviewing a trial court's denial of a motion for judgment of acquittal, this court must determine whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. McCart v. State, 765 So.2d

17

21, 27 (Ala.Crim.App. 1999)[.] . . . Ingram moved for a judgment of acquittal at the close of the State's case; however, he did not renew the motion at the close of all the evidence or include this claim in his motion for a new trial. Therefore, we consider only the State's evidence in reviewing this claim.

___ So.2d at ____. Similarly, here, Livingston moved for a judgment of acquittal at the close of the State's evidence, but he did not renew that motion at the close of all the evidence, nor did he file a motion for a new trial. Therefore, we review only the State's evidence in reviewing this claim.

The State's evidence indicated that on March 7, 2002, the victim, Cynthia Meinhardt, a licensed practical nurse employed by Saad's Health Care, a home health agency, went to the home of J.B. Livingston ("J.B."), an 86-year-old Alzheimer's patient, in Prichard. Meinhardt and other employees of Saad's had been providing in-home care to J.B. for several weeks. Meinhardt had been to the home on three prior occasions and on one of those occasions the appellant Livingston was there.

When Meinhardt arrived on March 7, 2002, Livingston opened the door to the house to let her in. After Meinhardt finished examining J.B., she had Livingston sign the nurse's worksheet, and she left. As she was turning around in the cul-de-sac next to the Livingstons' home, her cellular telephone rang. She answered it and it was Livingston. He informed Meinhardt that his mother was on the telephone and that she wished to speak with Meinhardt. Meinhardt went back in the house, took the telephone from Livingston, and said hello twice. No one answered, but as she was holding the telephone she felt a violent blow to the back of her head and blows to her back. She testified that she turned around to see Livingston with a knife in his hands, shouting repeatedly, "You fucking white bitch." Meinhardt testified that she fell to the floor and that Livingston continued to stab her, but that she was able to fight him off, exit the house, and get to her automobile. She drove herself a few blocks away and telephoned for assistance.

Meinhardt testified that she recognized Livingston from being in the home previously. She testified that he was wearing a white t-shirt and blue jeans at the time of the attack, that she had a tattoo on his arm that she had seen before ("R.I.P. MLK"), and that she recognized his voice.[21] She also testified that when she reentered the home, only Livingston was in the

---

[21]    "Photographs introduced at trial also reflected that Livingston had the phrase 'R.I.P. MLK' spray-painted on his bedroom wall." (Doc. 12, Exhibit 7, at 5 n.3 (citation omitted)).

kitchen and that she clearly remembered that it was Livingston who stabbed her.

The State, in anticipation of Livingston's defense that it was his grandfather, J.B., who had attacked Meinhardt, called medical and psychiatric personnel to testify that a person with the medical conditions of J.B. (advanced cardiac and respiratory disease, unsteady gait, weakness, etc.) would lack the strength to carry out such a violent attack. A psychiatrist, Zenia Zappher, who treated J.B. after the events of March 7, 2002, testified that J.B. not only lacked the physical capabilities to carry out such an attack, but also lacked the cognitive abilities, despite a history of striking out at others.[22] Dr. Zappher testified that it would not matter whether J.B. was taking the appropriate medications or not because, she explained, J.B. did not know what to do with a spoon, so he likely would not know to stab someone with a knife.

Livingston cross-examined Meinhardt and three of the law-enforcement officers who testified in an attempt to establish an inconsistency in the evidence with respect to Meinhardt's identification of him as the perpetrator of the crime. Charles Huggins, an investigator with the Alabama Bureau of Investigation, testified that Meinhardt, while in the emergency room after the attack, told him that the perpetrator was a [young] black male wearing a mask and that she did not tell him that her attacker was Livingston. Investigator Huggins also testified that Meinhardt was being prepped for surgery and appeared to be sedated at the time. Two other officers, Lt. Dorothy Ferrell Strother and Investigator Simon Benson, who spoke with Meinhardt at the hospital shortly before she was taken in for surgery, also testified that Meinhardt told them that the person who stabbed her had a mask on. Both officers, however, testified that they had to leave the room where Meinhardt was being held prior to surgery because the "machines" started going off, but that they were allowed back in the room a short time later, at which time Meinhardt told them that the attacker was Livingston and that he was wearing a white t-shirt and blue jeans.

The State called several persons, who spoke with Meinhardt shortly after the attack, to testify. These witnesses all testified that Meinhardt told them that the patient's (J.B.'s) grandson attacked her.

---

[22]    "Dr. Z[ap]pher conceded that J.B. had attacked two other healthcare providers while hospitalized after March 7, 2002, striking one healthcare provider in the head three times and kicking another healthcare provider in the stomach and breast." (Doc. 12, Exhibit 7, at 5 n.4 (citation omitted)).

The State also presented evidence that Livingston had blood all over his clothes after the attack. Another healthcare worker, Anna L. Hopper, testified that, shortly after the crime was committed, she pulled into the driveway of the Livingstons' home and telephoned the house because, she said, it appeared that no one was home. Livingston came out of the house and had a substantial amount of blood on him. Livingston told Hopper that J.B. had cut himself and that he had already called the paramedics. Hopper rushed into the house to attend to J.B.'s needs. When she entered, Hopper said, she noticed a large quantity of blood in the kitchen and observed that the kitchen was in disarray, appearing as if there had been a struggle. She saw J.B. sitting in a chair in the next room. She saw a very small amount of blood on him. Unable to find the source of the blood on J.B., she asked him where he was cut. J.B. did not answer, but Livingston then told her that J.B. did not cut himself, but had stabbed the nurse. Hopper left the home and telephoned Saad's to confirm that a nurse had been stabbed at the home.

The State also presented evidence that Livingston admitted to hiding his t-shirt that was covered with blood and [putatively] washing off the knife used in the stabbing before the police arrived. Livingston told Investigator Huggins that he did this to try to protect his grandfather.

This evidence was more than sufficient to sustain Livingston's conviction for attempted murder. Therefore, the trial court properly denied Livingston's motion for judgment of acquittal.

We have reviewed the record and can find no preserved issue warranting reversal of Livingston's conviction. Therefore, the judgment of the trial court is affirmed.

(Doc. 12, Exhibit 7, at 1-8 (most internal quotation marks and brackets omitted; some citations and footnotes omitted)).

Petitioner did not file a petition for rehearing in the Alabama Court of Criminal Appeals (Doc. 1, at 3) and clearly did not seek certiorari review by the Alabama Supreme Court inasmuch as the Alabama Court of Criminal Appeals issued its certificate of judgment of final affirmance on March 10, 2004 (Doc. 12, Exhibit 8).

After Livingston's direct appeal was concluded (*see id.*), the State filed a response to his Rule 32 petition on May 11, 2004, therein seeking the dismissal of the

collateral petition (*see* Doc. 12, Exhibit 9C). However, neither the State's response/motion to dismiss or the trial court's May 11, 2004 order denying Livingston's Rule 32 petition (*see* Doc. 12, Exhibit 9D)[23] were docketed (*see* Doc. 12, Exhibit 9, at 4-5; *compare id. with* Doc. 12, Exhibit 2A, at 7)[24]. Indeed, the docket sheets reflect the trial court's granting of numerous requests by Petitioner's retained counsel, Charles Wilson, Esquire, to reset the Rule 32 petition. (Doc. 12, Exhibit 2A, at 7-8; *see also* Doc. 12, Exhibits 9E & 9G (motion to continue filed May 14, 2004 and motion to continue filed June 23, 2004)). When, on June 24, 2004, the court reset the petition for June 30, 2004, the trial judge ordered that Livingston "be brought back from the DOC." (Doc. 12, Exhibit 2A, at 8; *compare id. with* Doc. 12, Exhibit 9G (face of the motion to continue Rule 32 hearing reflects a resetting to June 30, 2004) *and* Doc. 12, Exhibit 9F (request emailed to the transfer agent supervisor at Kilby Correctional Facility on June 23, 2004 that Livingston be transferred to the Mobile County Metro Jail)). And when, on June 30, 2004, the court reset the case for a Rule 32 hearing on August 6, 2004, the court ordered  Livingston "to remain at Metro[.]" (Doc. 12, Exhibit 2A, at 8; *see also* Doc. 12, Exhibit 9H (notice by the Clerk's Office that the Court ordered that Livingston was to be held at the Mobile County Metro Jail for the hearing on August 6, 2004)). And, finally, when the case was, once again, reset for a hearing on August 10, 2004 (Doc. 12,

---

[23]     The trial court's two-page order is not replicated herein primarily because it does not specifically identify Livingston's specific allegations of ineffective assistance of trial and appellate counsel (*see id.*); however, the undersigned has already identified all claims raised by Livingston in his Rule 32 petition.

[24]     As well, the docket sheet does not reflect the April 22, 2004 notice sent by the Mobile County Circuit Clerk's Office setting a Rule 32 hearing on May 17, 2004. (*Compare id. with* Doc. 12, Exhibit 9B (notice)).

Exhibit 2A, at 8), the hearing was not conducted on August 10, 2004, and, that same date, Livingston was ordered to be sent back to the penitentiary, the trial judge noting on the docket sheet that "Rule 32 has already been denied on May 11, 2004." (*Id.*).

For the next (approximately) ten years, Livingston filed no other state collateral petition (Doc. 1, at 4-5) or, indeed, any motion/petition of any ilk. Petitioner now avers, by pointing to various letters he allegedly penned over the years to Judge Thomas, his trial attorney (Jeff Deen), and Assistant District Attorney John Furman, that he was duly diligent in attempting to garner a Rule 32 evidentiary hearing and exhaust his state collateral remedies before filing his § 2254 petition in this Court. (*See* Attachments to Doc. 8.) There are a total of four letters to Judge Herman Thomas, dated August 27, 2004, September 14, 2004, February 24, 2005, and November 13, 2007, the first three of which simply ask the trial judge for a new court date for his evidentiary hearing (*see* Doc. 8, Exhibit A); one letter addressed to Jeff Deen and dated March 3, 2005, asking Deen to tell Petitioner's father what to do about him getting a new court date on his Rule 32 petition (Doc. 8, Exhibit I); and one letter addressed to Assistant District Attorney John Furman, dated May 24, 2007, asking for his assistance in receiving a Rule 32 evidentiary hearing. (Doc. 8, Exhibit M).[25] Most curious about the letters to Deen and

---

[25] The remainder of the letters allegedly penned by Livingston to the trial court simply seek assistance in obtaining a copy of a trial transcript (*see* Doc. 8, Exhibits J-L, N-O & R (letters dated October 7, 2005, December 9, 2006, January 18, 2006, September 17, 2008, October 18, 2009, and August 14, 2013)); however, these letters simply cannot and do not speak to due diligence because, as previously established, Livingston received a copy of his trial transcript from his appellate attorney, Glen Davidson, back in December of 2003 (*see, e.g.,* Doc. 12, Exhibit 3, at 28), a copy of which he specifically referenced and utilized in filing his Rule 32 collateral petition in the Circuit Court of Mobile County, Alabama on or about December 17, 2003 (*see* Doc. 12, Exhibit 9A, at 14-15). Indeed, because Livingston has been in possession of a copy of his trial transcript since December of 2003, the undersigned questions whether the foregoing letters were actually penned and mailed by Petitioner on the foregoing (Continued)

Furman is that neither man represented Livingston during his Rule 32 collateral proceedings; instead, Petitioner was represented by retained counsel, Charles Wilson, and yet there are no letters to Wilson about any "new" setting for his Rule 32 evidentiary hearing, the status of his Rule 32 petition, or about the need to file his § 2254 petition.[26] In addition, with respect to the letters allegedly penned to Judge Thomas, the undersigned finds it interesting that none of these four letters made it into the record, particularly since three letters from Livingston, dated January 19, 2005, March 6, 2006, and May 23, 2006, are part of the record (Doc. 12, Exhibit 9I).[27]

On May 12, 2014, Livingston filed a pleading in the Mobile County Circuit Court seeking either the Clerk of Court's compliance (or the trial court's compliance) with Alabama's "Presumptive Sentencing Standards Guidelines[.]" (Doc. 12, Exhibit 10.)

---

dates. Notwithstanding this observation, in none of these letters does Livingston make any mention of his Rule 32 petition, thereby belying any inference that he knew nothing about the disposition of his Rule 32 petition or was laboring under the belief that he was going to be granted an evidentiary hearing.

And the remainder of Petitioner's letters, to various human rights organizations, dated May 18, 2006, December 14, 2010, and April 14, 2011 (Doc. 8, Exhibits P, Q & S), do not speak to due diligence, as they obviously do not constitute an attempt to inquire about the status of the Rule 32 petition and they nowhere mention anything with respect to his inability to file a § 2254 petition; instead, these letters simply indicate Livingston's attempts to interest anyone in helping him because of a failure of the state courts to grant him relief. Indeed, the letter Livingston penned to the National Headquarters for the NAACP on April 14, 2011 conclusively establishes that Petitioner knew that the trial court was not going to grant him Rule 32 relief. (Doc. 8, Exhibit Q ("I filed a Rule 32 petition showing how they violated law and my rights but the Court[] purposely lost or destroyed my petition then said I didn't file one[.] [I]f that[']s the case I would have never been transferred back to court for a[n] evidentiary hearing.")).

[26]     Indeed, in none of the letters that Petitioner penned is any mention made of the need to gain knowledge because of his pending deadline to file his § 2254 petition.

[27]     In the three letters that are contained in the record, Livingston makes no reference to his Rule 32 petition and certainly gives no indication that he was still "owed" a hearing.

Petitioner's motion was denied by endorsement on April 14, 2016 by Circuit Judge Michael A. Youngpeter. (Doc. 12, Exhibit 11 ("The presumptive guidelines do not apply to your case.")). And on April 13, 2016, Livingston filed a motion seeking placement in Community Corrections (Doc. 12, Exhibit 12, at 2) and attached thereto a letter containing an implicit admission of guilt (*see id.* at 3 ("I Michael Antonio Livingston promise to obey all rules and regulations of Community Corrections to the fullest no exceptions. ***I made a mistake in the past that I'm truly sorry and remorseful for. I know GOD has forgiven me and is willing to give me another chance at life. I'm not the man that I use[d] to be. Prison has truly changed my whole outlook on life.***")).[28] This motion was also denied by endorsement on April 14, 2016 by Judge Youngpeter: "Due to the nature of the offense, you do not qualify for diversion to community corrections. Any early release is in the hands of DOC through parole." (Doc. 12, Exhibit 13).

On April 26, 2016, Livingston filed a request for a new trial (Doc. 12, Exhibit 14), which the trial court, on April 27, 2016, deemed as an attempt to file a timely Rule 32 petition (Doc. 12, Exhibit 15). "The Court accepts said pleading as a Rule 32 petition, but herein ORDERS that Petitioner, within forty-five (45) days, resubmit his petition in compliance with Rule 32.6 (a) & (b) of the Alabama Rules of Criminal Procedure. The filing date of a resubmitted petition will relate back to the date of Petitioner's April 26, 2016, pleading." (*Id.*). When Livingston did not comply with the trial court's order dated

---

[28]     Neither request made by Livingston, first in May 2014 and then in April 2016, make mention of any collateral petition or the trial court's failure to conduct an evidentiary hearing. (*See* Doc. 12, Exhibits 10 & 12.)

April 27, 2016, "the request/petition dated April 21, 2016" was denied. (Doc. 12, Exhibit 16.)

By letters dated September 7, 2016, and October 11, 2016, Livingston again requested a new trial (Doc. 12, Exhibit 16A, at 2-5), both letters requesting the reviewing judge to look into his case (*see id.* at 3 & 5) and the former letter referencing a blind man's ability to see the truth of his innocence (*see id.* at 4).[29] And although both letters make reference to Petitioner's December 17, 2003 Rule 32 petition, and subsequent proceedings following the conclusion of his direct appeal (*see id.* at 2 & 4), the undersigned simply quotes at some length from the letter dated October 11, 2016, as follows:

> I filed a Rule 32 in the past[,] was brought back to Court[,] sat in the county jail for 2 weeks[,] never talked to anyone[,] never went before the Judge[,] and[,] finally[,] after 2 weeks they say they have no record of my Rule 32 or how I got there[.] Come on Judge Youngpeter[,] you know there[']s no way they'll bring me back to Court if they hadn't known about this Rule 32[.] [Y]ou see[,] they know they sent an innocent man to prison so they say they lost it and have no record of it to keep me out of Court to cover up what they did to me. And I'm asking you to please grant me a new trial[.] Like I said before if you look into my case you'll see all the crooked and illegal stuff they did to me. I've been trying to get back in Court for 14 years straight and every time I try something they deny it[.]

(*Id.* at 2.) On October 19, 2016, the following endorsement was made: "I cannot 'look' into your case unless you file a Rule 32 petition. You also must either pay the filing fee

---

[29]   As reflected above, the undersigned has reviewed the entirety of the record in this matter and finds no evidence of Petitioner's innocence. The question of whether Livingston was guilty of the attempted murder of Cynthia Meinhardt was a question for the jury.

for such a petition or file an In Forma Pauperis petition. My Orders dated April 27, 2016 and August 3, 2016 explained that to you." (*Id.*)[30]

Livingston filed the instant federal habeas corpus petition in this Court on or about March 6, 2017 (*see* Doc. 1, at 54), and therein contends that his trial attorney provided constitutionally ineffective assistance by failing: (1) to allow Petitioner to testify in his own defense in order to rebut or refute Meinhardt's testimony and to negate Agent Huggins' testimony regarding the statement he made to the agent on March 7, 2002; (2) to subpoena Meinhardt's cell phone records in order to "test" her trial testimony, particularly the testimony that she called her husband and Saad's co-employees and informed them that her patient's grandson stabbed her; (3) to call as witnesses medical staff members from the Harper Center and the Mobile Infirmary to testify regarding the assaults they endured at the hands of his grandfather, J.B. Livingston; (4) to call as

---

[30]   Livingston filed a petition for writ of mandamus in the Court of Criminal Appeals on November 29, 2016, requesting the appellate court to direct the Clerk of the Mobile County Circuit Court to furnish him with copies of various documents he had requested. (Doc. 12, Exhibit 17 (documents listed did not include the trial transcript)).

> This mandamus petition is filed against a circuit clerk. According to § 12-17-24, Ala.Code 1975, the Presiding Judge of the Mobile Circuit Court, the Honorable John R. Lockett, has direct supervisory authority over "clerks . . . and other court employees of the circuit and district courts within the circuit." In accordance with § 12-17-24, Ala. Code 1975, this petition is hereby **TRANSFERRED** to the Presiding Judge of the Mobile Circuit Court for that Court to consider this supervisory writ.

(Doc. 12, Exhibit 18.) It appears that this writ is still pending in the Mobile County Circuit Court. (*See* Doc. 12, at 10).

In addition to the foregoing, Livingston filed a petition for writ of habeas corpus in the Circuit Court of Escambia County, Alabama on January 26, 2017 seeking to challenge his conviction and sentence (Doc. 1, at 5); however, that court denied Petitioner's motion to proceed *in forma pauperis*, as well as his motion to reconsider that decision (*see* Doc. 8, Exhibits C & D).

witnesses other home healthcare nurses from Saad's, particularly Cheryl Moore, to testify about the conduct of his grandfather on the day Meinhardt was stabbed and on other days; (5) to object to Dr. Zappher's testimony regarding treatment that J.B. Livingston received at the Harper Center that she did not actually provide; (6) to subpoena the security tapes from the daycare center across from J.B. Livingston's house; and (7) to preserve for review an instance of jury tampering.

Although the undersigned initially entered a Rule 4 report and recommendation that Livingston's § 2254 petition be dismissed as time-barred (*see* Doc. 4), the Court thereafter declined to adopt the report and recommendation, instead holding it in abeyance pending the response of Warden Streeter (Doc. 9, at 1)[31]. The undersigned now simply considers the equitable tolling arguments made by the Petitioner in his response to the Warden's answer (*see* Doc. 14, at 2-15). Therein, Livingston contends that he is entitled to equitable tolling of the one-year limitations period because the trial court never sent him notice (or a copy) of its May 11, 2004 dismissal order and, therefore, he could not have known of the dismissal until such notice was given (*id.* at 6; *see also id.* at 9 ("There is an issue about whether the petitioner received notice of Judge Herman Thomas['s] May 11, 2004, order dismissing his Rule 32 petition. The record provided by the State surely does not show any proof that this order was sent since Judge Thomas's order does not contain a certificate of service and no other order of dismissal is provided."); *see id.* at 12 ("The Courts denied him th[e] right to exhaust his remedies by failing to provide fair notice of its denial.")), which he alleges occurred

---

[31]     The Respondent filed his answer on June 30, 2017 (*see* Doc. 12) and therein contends both that Livingston's § 2254 petition is time-barred (*id.* at 12-19) and, alternatively, that his claims have been procedurally defaulted (*id.* at 19-22).

"on July 10, 2017, the day he received his trial transcripts per [] this court's order." (*Id.* at 14.) In addition, Petitioner makes conclusory references to his ignorance of the law (Doc. 14, at 10), his family's financial inability to hire an attorney to file his Rule 32 petition (*id.*),[32] that he did not have a copy of the trial transcript at the time of the filing of his state collateral petition (*see id.* at 10-11), and his sporadic access to the law library at Bibb County Correctional Facility (*see id.* at 11-12), as perhaps impacting his ability to file a timely federal petition; however, it is not at all clear that he has cited to any of these "circumstances" in support of his equitable tolling argument (*see, e.g., id.* at 11 ("Without the record it is impossible to review trial and pretrial proceedings thoroughly and point to specific errors that were made in violation of constitutional guarantees. Even so, ***this is not an excuse to toll the time*** so the petitioner had to use whatever resources ADOC provided him with.")).

With respect to the Respondent's procedural default defense, Petitioner makes the following argument:

> The Respondent[] also assert[s] that since the petitioner has new claims that were not presented in his Rule 32 petition and should be procedurally barred pursuant to Section 2254(b)(1)(A) of Title 28 of the U.S. Code. This is true, however the requirements of this code does have exceptions to when a petitioner can bypass exhaustion requirements. One of those exceptions are that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."
>
> In the petitioner's exhibits in which the State has provided the petitioner and court with there is evidence that appellate counsel allegedly sent a copy of his Anders brief and the trial record on appeal. (Exhibit 3) However, there are several exhibits, orders, and documents that the trial court, and various other court personnel alleges to have took action on but

---

[32]     The record makes clear that while Petitioner did, indeed, file his Rule 32 petition *pro se*, while his direct appeal was pending his family managed to hire Charles Wilson, Esquire, to prosecute his Rule 32 petition.

there just is no record of notice on case action summary or letters with postmark dates, or legal mail logs at Bibb County Correctional Facility. **The petitioner submitted his Rule 32 petition and habeas corpus petition without a record on appeal.** And after he inquired about receiving records to the Mobile County Circuit Clerk's Office [o]n November 6, 2016 (Exhibit 17). However, the petitioner received only an Anders Brief and a case action summary sheet and transcript of conviction report. It is with these records that the petitioner filed a habeas petition on January 26, 2017. The trial court of Escambia County denied forma pauperis and petitioner filed [a] motion to reconsider which was denied. Petitioner then filed a habeas corpus petition with this Court on March 6, 2017. **As to the petitioner's new claims in his habeas petition to this court, [they] were brought about because the petitioner had never reviewed the record so the issues in his Anders Brief and the limited part that the court did provide had been withheld for over 14 years. Had the petitioner had these records on the initial filing of his appeal and Rule 32 petition he could have reviewed the limited portion of the record and raised these issues. Through no fault of his own[,] the petitioner was kept away from these documents until 2017 and when he did receive those documents he diligently sought relief through habeas corpus petition. The fact that personnel of the Court alleges that they sent documents but have no postmark dates or prison record logs to verify that notice was sent. The Ala. Court case action summary or Mobile County Circuit Court does not even show that notice was sent to the petitioner. And for this reason these procedural claims which involve a gross disrespect for fairness in trial proceedings should be heard on the merits and allowed to proceed in this court.**

(Doc. 14, at 15-18 (emphasis supplied)).

## CONCLUSIONS OF LAW

A.    **Statute of Limitations.**    The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") was enacted on April 24, 1996 and, pertinent to this case, added a new subdivision to 28 U.S.C. § 2244 providing for a one-year period of limitations within which state prisoners must file their habeas corpus petitions pursuant to 28 U.S.C. § 2254. *Wilcox v. Florida Dep't of Corrections*, 158 F.3d 1209, 1210 (11th Cir. 1998).

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Subsections (B), (C), and (D) of § 2244(d)(1) clearly do not apply to petitioner's case and, therefore, the timeliness of Livingston's petition must be calculated under § 2244(d)(1)(A) based upon the date on which his attempted murder conviction became final. "For prisoners whose convictions became final prior to the effective date of the AEDPA, the one-year statute of limitations instituted by the AEDPA began to run on its effective date, i.e., April 24, 1996." *Guenther v. Holt*, 173 F.3d 1328, 1331 (11th Cir. 1999) (citations omitted), *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). This rule from *Guenther* is obviously not applicable in this case because Livingston's conviction became final in 2004.

Section 2244(d)(1)(A) specifically provides that the one-year limitations period will run from "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review[.]" On direct appeal, the Alabama Court of Criminal Appeals affirmed Livingston's conviction and sentence on February 20, 2004. *Livingston v. State,* 910 So.2d 832 (Ala. Crim. App. Feb. 20, 2004) (table). Because Livingston did not seek rehearing in the Alabama Court of Criminal Appeals or petition for certiorari review in the Alabama Supreme Court, his conviction became final on March 10, 2004, when the Alabama Court of Criminal Appeals issued a certificate of final judgment of affirmance (Doc. 12, Exhibit 8). *Brown v. Hooks*, 176 Fed. Appx. 949, 951 (11th Cir. Apr. 18, 2006) ("On March 23, 2001, the Alabama Court of Criminal Appeals affirmed his conviction. Brown did not petition for *certiorari* review in the Alabama Supreme Court, and his conviction became final on April 10, 2001, when the Certificate of Judgment issued.");[33] s*ee also Bridges v. Johnson*, 284 F.3d 1201, 1202 (11th Cir. 2002) ("Bridges pled guilty to terroristic threats, aggravated assault and stalking charges, and was sentenced to 26 years' imprisonment on November 12, 1996. He did not appeal his convictions and sentences, but he did request that his sentence be reviewed by a sentence review panel, pursuant to O.C.G.A. § 17-10-6. . . . As provided in 28 U.S.C. § 2244(d)(1)(A), his judgment became final on the date that the time for seeking direct review expired; this date was not affected by his application for sentence review, because an application for sentence review is not a part of the direct appeal process under Georgia law. . . . Accordingly, Bridges' judgment of conviction

---

[33]      "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

became final on December 21, 1996, the date on which his 30-day right to appeal the November 21, 1996 judgment expired."); *Tinker v. Moore*, 255 F.3d 1331, 1332 & 1333 (11th Cir. 2001) ("Tinker was convicted on the robbery charge, and on January 29, 1997, the Third District Court of Appeal affirmed his conviction. . . . The mandate issued on February 14, 1997. . . . Under Florida law, a judgment against a criminal defendant becomes final upon issuance of the mandate on his direct appeal. . . . Tinker's mandate issued on February 14, 1997, and thus he had until February 13, 1998, to file his § 2254 petition, absent tolling of the limitations period."), *cert. denied*, 534 U.S. 1144, 122 S.Ct. 1101, 151 L.Ed.2d 997 (2002).[34] Thus, Livingston's limitations period would have

---

[34]   This Court recognizes that AEDPA's one-year statute of limitations "allows a prisoner the time to seek direct review in the Supreme Court of the United States." *Pugh v. Smith*, 465 F.3d 1295, 1299 (11th Cir. 2006); *see also Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002) ("Appellant was entitled to file a petition for writ of certiorari in the United States Supreme Court within 90 days of the entry of the judgment against him by the Florida Supreme Court. Sup.Ct.R. 13.1. The statute of limitations under 28 U.S.C. § 2244(d) should not have begun to run until this 90-day window had expired. Appellant's state judgment became final on December 13, 1996, when the Florida Supreme Court denied Appellant's motion for a rehearing. The statute of limitations should have begun to run, therefore, on March 17, 1997."). However, in those instances, as here, where a petitioner is not entitled to seek review in the Supreme Court of the United States, he is not entitled to the benefit of the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court, Sup. Ct. R. 13.1 ("Unless otherwise provided by law, a petition for writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort . . . is timely when it is filed with the Clerk of this Court within 90 days after the entry of the judgment. A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review."); 28 U.S.C. § 1257(a) ("Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where . . . any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States."). *See Pugh,* 465 F.3d at 1299-1300. As previously indicated, Livingston did not seek certiorari relief in the state court of last resort, that is, the Alabama Supreme Court; therefore, he was not entitled to seek direct review in the United States Supreme Court. *See id.* Livingston's conviction became final when the certificate of judgment issued from the Alabama Court of Criminal Appeals on March 10, 2004, *Brown, supra,* and this Court need not add to that final judgment date the 90 days contemplated in Supreme Court Rule 13.1, *compare Pugh,* 465 F.3d at 1299-1300 *with Tinker, supra,* 255 F.3d at 1332 & 1333.

commenced on March 10, 2004, and expired on March 10, 2005, had Petitioner not already have pending in the Circuit Court of Mobile County, Alabama a Rule 32 petition, which was filed on or about December 17, 2003 and held in abeyance until after his direct appeal was completed on March 10, 2004. In other words, because Livingston had already filed a Rule 32 petition while his direct appeal was pending, he is able to take advantage of the tolling provision built into § 2244(d), 28 U.S.C. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section."); *Guenther, supra*, 173 F.3d at 1331 ("'The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation in [subsection (d)].'"), and his limitations period was tolled until, as the respondent argues (Doc. 12, at 16) with no contrary argument from Livingston (*see* Doc. 14), June 22, 2004, forty-two days after the trial court's May 11, 2004 dismissal of his Rule 32 petition (*see* Doc. 12, at 16, citing Ala.R.App.P. 4). *Compare McMillan v. Secretary for the Dep't of Corrections,* 257 Fed.Appx. 249, 252 (11th Cir. Dec. 6, 2007) ("The Supreme Court recently clarified that '[t]he time that an application for state postconvicton review is "pending" includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, *provided that* the filing of the notice of appeal is timely under state law.' *Evans v. Chavis,* 546 U.S. 189, 191, 126 S.Ct. 846, 849, 163 L.Ed.2d 684 (2006) . . . . This Court has further held that an application remains pending until the time to seek appellate review expires if a petitioner does not file a notice of appeal. *Cramer v. Sec'y, Dep't of*

*Corr.,* 461 F.3d 1380, 1383 (11th Cir. 2006)." (emphasis in original)) *with Couch v. Talladega Circuit Courts,* 2013 WL 3356908, *3 n.10 (N.D. Ala. Jul. 3, 2013) ("Rule 32.10 of the Alabama Rules of Criminal Procedure provides that either party may appeal a circuit court's ruling on a Rule 32 petition by filing a timely notice of appeal in accordance with Rule 4 of the Alabama Rules of Appellate Procedure. . . . Rule 4, in turn, provides that a notice of appeal must be filed 'with the clerk of the trial court within 42 days (6 weeks) of the date of the entry of the judgment or order appealed from.'" (citations omitted)). Thus, Livingston's one-year limitations period began running on June 22, 2004 and expired on June 22, 2005, almost twelve (12) years before he filed the instant habeas corpus petition in this Court on March 6, 2017. (Doc. 1, at 54). And because Petitioner makes no "further" argument in favor of statutory tolling,[35] the only avenue by which this Court can consider the merits of petitioner's § 2254 petition is by

---

[35]     The fact that Alabama law provides that a defendant may seek an out-of-time appeal from the dismissal of a Rule 32 petition by filing another Rule 32 petition seeking that relief under 32.1(f), *see Ex parte V.S.,* 918 So.2d 908, 912 n.3 (Ala. 2005) ("On January 13, 2005, this Court adopted an order amending Rule 32.1(f), Ala.R.Crim.P., effective June 1, 2005. The amended rule provides that a petitioner may obtain an out-of-time appeal if '[t]he petitioner failed to appeal within the prescribed time from the conviction or sentence itself or from the dismissal or denial of a petition previously filed pursuant to this rule and that failure was without fault on the petitioner's part.' Therefore, after June 1, 2005, the proper method of seeking an out-of-time appeal from the denial of a Rule 32 petition is by filing another Rule 32 petition."), offers no additional argument for Livingston in this case given that the one-year limitations period has long since expired and the Eleventh Circuit has specifically rejected "the argument that a state post-conviction motion remains 'pending' after the standard time to file an appeal expires merely because a state provides a procedure for seeking an out-of–time appeal in special circumstances or because a state court ultimately grants a petition for an out-of-time appeal." *McMillan, supra,* 257 Fed.Appx. at 253; *see also Moore v. Crosby,* 321 F.3d 1377, 1380 (11th Cir. 2003) ("[W]e hold that the petitioner's belated appeal motion was not pending during the limitations period. The statutory tolling provision does not encompass a period of time in which a state prisoner does not have a 'properly filed' post-conviction application actually pending in state court. A state application filed after expiration of the limitations period does not relate back so as to toll idle periods preceding the filing of the federal petition.").

finding that he is entitled to equitable tolling of AEDPA's one-year limitations period, or, otherwise, by finding that he has established his factual innocence of the crime— attempted murder—for which he was convicted by a jury of his peers on April 2, 2003.

In *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010), the Supreme Court specifically held, for the first time, that "§ 2244(d) is subject to equitable tolling in appropriate cases[,]" *id.* at 645, 130 S.Ct. at 2560, and reiterated "that a 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 649, 130 S.Ct. at 2562. For its part, the Eleventh Circuit has long embraced the doctrine of equitable tolling with regard to the one-year limitations period at issue: "Equitable tolling is to be applied when '"extraordinary circumstances" have worked to prevent an otherwise diligent petitioner from timely filing his petition.' . . . Thus, the petitioner must show both extraordinary circumstances and due diligence in order to be entitled to equitable tolling." *Diaz v. Secretary for the Dep't of Corrections*, 362 F.3d 698, 700-701 (11th Cir. 2004) (citation omitted). "Section 2244 is a statute of limitations, not a jurisdictional bar. Therefore, it permits equitable tolling 'when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence.'" *Steed v. Head,* 219 F.3d 1298, 1300 (11th Cir. 2000) (citation omitted). Thus, the one-year limitations provision need not be equitably tolled unless there is evidence that "extraordinary circumstances" beyond petitioner's control made it impossible for him to file his petition on time.  *See Miller v. New Jersey State Dep't of Corrections*, 145 F.3d 616, 618-619 (3rd Cir. 1998) ("[E]quitable tolling is proper only when the 'principles of equity would make [the] rigid

application [of a limitation period] unfair.' . . . Generally, this will occur when the petitioner has 'in some extraordinary way . . . been prevented from asserting his or her rights.' . . . The petitioner must show that he or she 'exercised reasonable diligence in investigating and bringing [the] claims.' . . . Mere excusable neglect is not sufficient."). The Supreme Court in *Holland* indicated that "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence[,]" *id*. at 653, 130 S.Ct. at 2565, and gave the following guidance with respect to "extraordinary circumstances":

> We have previously held that "a garden variety claim of excusable neglect," such as a simple "miscalculation" that leads a lawyer to miss a filing deadline, does not warrant equitable tolling. But the case before us does not involve, and we are not considering, a "garden variety claim" of attorney negligence. Rather, the facts of this case present far more serious instances of attorney misconduct. And, as we have said, although the circumstances of a case must be "extraordinary" before equitable tolling can be applied, we hold that such circumstances are not limited to those that satisfy the test that the Court of Appeals used in this case.

> The record facts that we have set forth in Part I of this opinion suggest that this case may well be an "extraordinary" instance in which petitioner's attorney's conduct constituted far more than "garden variety" or "excusable neglect." To be sure, Collins failed to file Holland's petition on time and appears to have been unaware of the date on which the limitations period expired—two facts that, alone, might suggest simple negligence. But, in these circumstances, the record facts we have elucidated suggest that the failure amounted to more: Here, Collins failed to file Holland's federal petition on time despite Holland's many letters that repeatedly emphasized the importance of his doing so. Collins apparently did not do the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rules. Collins failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite Holland's many pleas for that information. And Collins failed to communicate with his client over a period of years, despite various pleas from Holland that Collins respond to his letters.

*Id.* at 651-652, 130 S.Ct. at 2564. It is also clear that a federal court can consider the merits of an untimely § 2254 motion if the petitioner establishes that he is factually innocent of the crime for which he was convicted. *See San Martin v. McNeil,* 633 F.3d 1257, 1268 (11th Cir.) ("The actual innocence exception is 'exceedingly narrow in scope,' and the petitioner must demonstrate that he is factually innocent rather than legally innocent."), *cert. denied sub nom. San Martin v. Tucker,* 565 U.S. 843, 132 S.Ct. 158, 181 L.Ed.2d 73 (2011).

In this case, petitioner has not established that the instant habeas corpus petition was timely filed nor has he established that extraordinary circumstances and due diligence counsel equitable tolling of the limitations period. *Compare Spottsville v. Terry*, 476 F.3d 1241, 1245 (11th Cir. 2007) ("'The burden of establishing entitlement to this extraordinary remedy plainly rests with the petitioner[.]'") *with Pugh, supra,* 465 F.3d at 1300-01 ("Pugh bore the burden of establishing that equitable tolling was warranted."). The primary argument made by Petitioner, as aforesaid, is that he is entitled to equitable tolling of the one-year limitations period because the trial court never sent him notice (or a copy) of its May 11, 2004 dismissal order and, therefore, he could not have known of the dismissal until such notice was given (Doc. 14, at 6; *see also id.* at 9 ("There is an issue about whether the petitioner received notice of Judge Herman Thomas['s] May 11, 2004, order dismissing his Rule 32 petition. The record provided by the State surely does not show any proof that this order was sent since Judge Thomas's order does not contain a certificate of service and no other order of dismissal is provided."); *see id.* at 12 ("The Courts denied him th[e] right to exhaust his remedies by

failing to provide fair notice of its denial.")), which he alleges occurred "on July 10, 2017, the day he received his trial transcripts per [] this court's order." (*Id.* at 14).

The Eleventh Circuit has "ruled that a petitioner was entitled to equitable tolling where the state court had assured the petitioner that it would contact him as soon as a decision was made, the court subsequently sent notice of the decision to the wrong person, *and* the petitioner demonstrated diligence in inquiring about the status of his case when the court failed to contact him after 15 months[;]" however, "a habeas petitioner is not necessarily entitled to 'equitable tolling until he receives notice.'" *Logreira v. Secretary for the Dep't of Corrections,* 161 Fed.Appx. 902, 903 (11th Cir. Jan. 11, 2006) (citing and quoting *Knight v. Schofield,* 292 F.3d 709, 710-11 & 711 (11th Cir. 2002)), *cert. denied,* 549 U.S. 858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006).

Initially, the Petitioner's argument that he did not receive notice of the trial court's May 11, 2004 dismissal of his Rule 32 petition until July 10, 2017 (Doc. 14, at 14) is belied by the trial court's August 10, 2004 entries on the docket sheet that Livingston was to be sent back to the penitentiary and that the "Rule 32 has already been denied on May 11, 2004." (Doc. 12, Exhibit 2A, at 8.) In addition, that Livingston received notice, on August 10, 2004, that his Rule 32 had previously been denied is consistent with the failure of Petitioner's retained Rule 32 counsel, Charles Wilson, to file any further requests for an evidentiary hearing setting and Petitioner's failure to any in manner communicate with or contact Wilson about a future evidentiary hearing setting. However, even if the foregoing conclusions are somehow inaccurate, Petitioner's equitable tolling argument still fails because although he provided evidence of sporadic attempts to contact Mobile County Circuit Judge Herman Thomas through the mail to

inquire about the status of his Rule 32 petition/evidentiary hearing setting, in the form of four letters penned from August 14, 2004 through November 14, 2007,[36] he has not shown that he took any steps, other than mailing letters,[37] to gain information regarding his Rule 32 petition.[38] In particular, Petitioner has offered no evidence that he filed any motions with the trial court regarding the status of his Rule 32 petition, that he called the court about the status of his petition, or that he called (or sought help) from his retained Rule 32 counsel, Charles Wilson, asking that he contact the trial court about the status of his petition or a new evidentiary hearing setting. Indeed, the Petitioner has offered no evidence that he communicated with Wilson (whether by letter or telephone call) at any time after August of 2004 to discuss the status of his Rule 32 petition, though retained

---

[36]   As the undersigned has previously explained, it is curious that these four letters penned to Judge Thomas nowhere appear in the record given that several letters penned by Livingston to Thomas do appear in the state court record. Of course, in none of the letters that do appear in the record did Livingston inquire about the status of his Rule 32 petition/an evidentiary hearing setting.

[37]   As also previously indicated, Petitioner's alleged attempts to "reach out" to his trial attorney, Jeff Deen, and Assistant District Attorney John Furman do not "advance" his argument regarding due diligence because neither man represented Petitioner at the time he was pursuing his Rule 32 petition.

[38]   And the six letters Petitioner allegedly penned to the Mobile County Circuit Court seeking assistance in obtaining a copy of his trial transcript—one in 2005, two in 2006, one in 2008, one in 2009, and one in 2013—do not aid his due diligence argument because none of them contain any request regarding the status of his Rule 32 petition (see Doc. 8, Exhibits J-L, N-O & R). Moreover, as aforesaid, the undersigned questions that the foregoing letters were written when Petitioner indicates they were written, given that Livingston certainly had a copy of his trial transcript (as well as his appellate brief) in December of 2003 and has not once indicated that the documents he received in December of 2003 were lost, confiscated, or destroyed. And, of course, any future argument by Petitioner that these documents were lost, confiscated, or destroyed would beg the question of how Livingston managed to retain all copies of the letters he attached to his first set of objections (see Doc. 8, Attachments). In addition, any such future argument would not overcome the fact that Petitioner was in possession of these documents when he filed his Rule 32 petition in the Circuit Court of Mobile County, Alabama on (or about) December 17, 2003.

Rule 32 counsel[39] certainly represented the most logical person for Petitioner to have contacted. What most impresses the undersigned about the foregoing facts are the large swaths of time that Petitioner made no inquiries about the status of his Rule 32 petition, essentially from 2008 forward, but even if this Court considers every letter penned by Livingston to the trial court to have contained an implicit request regarding the status of his Rule 32 petition, Petitioner still made no inquiries about the status of his Rule 32 petition anytime in 2010 through 2012 and certainly made no such inquiries anytime from 2014 through April of 2016. *See Diaz, supra,* 362 F.3d at 702 ("In this case, Diaz cannot show due diligence. After waiting 258 days to file his initial federal habeas petition, he waited another 274 days before filing his second federal petition after his motion for rehearing of his state habeas petition was denied. Without considering the time that the initial federal habeas petition was pending or the time that the state collateral proceedings were pending, the two foregoing delays total 532 days, exceeding Diaz's one-year time limitation by 167 days. Diaz offers no excuse for this delay. Thus, this delay alone constitutes a lack of due diligence and disentitles Diaz to equitable tolling." (footnotes omitted)). And, finally, when the Mobile County Circuit Court informed Livingston in October 2016 that it could not look into his case unless he filed a Rule 32 petition, he waited almost another five months before filing the instant petition.

---

[39]   While it is clear that Wilson was not retained when Petitioner filed his Rule 32 petition on December 17, 2003 (*see* Doc. 12, Exhibit 9A), there can be no question but that Wilson was retained to represent Livingston with respect to his Rule 32 petition (*see* Doc. 12, Exhibit 2A, at 7).

In light of the foregoing, the undersigned recommends that this Court find that Livingston has failed to meet his burden of showing that he exercised sufficient due diligence in inquiring with the Mobile County Circuit Court about the status/disposition of his Rule 32 petition so that he could file his federal petition.[40] *Cf. Pollock v. Secretary,*

---

[40]     To the extent Petitioner intended his conclusory references to his ignorance of the law, his family's financial inability to hire an attorney to file his Rule 32 petition, his alleged filing of the state collateral petition without benefit of the trial transcript, and his sporadic access to the law library at Bibb Correctional Facility, to further inform his argument in favor of equitable tolling of the one-year limitations period, none of these "facts" aid Livingston. First, ignorance of the law is insufficient to support equitable tolling of the statute of limitations. *Compare Moore v. Frazier,* 605 Fed.Appx. 863, 868 (11th Cir. Mar. 31, 2015) ("We have stated that 'pro se litigants, like all others, are deemed to know of the one-year statute of limitations.' . . . And we have not accepted a lack of a legal education as an excuse for a failure to file in a timely fashion."), *cert. denied,* 136 S.Ct. 124, 193 L.Ed.2d 97 (2015), *with Kreutzer v. Bowersox,* 231 F.3d 460, 463 (8th Cir. 2000) (recognizing that "[e]ven in the case of an unrepresented prisoner alleging a lack of legal knowledge or legal resources, equitable tolling has not been warranted."), *cert. denied sub nom. Kreutzer v. Al Luebbers,* 534 U.S. 863, 122 S.Ct. 145, 151 L.Ed.2d 97 (2001); *Marsh v. Soares,* 223 F.3d 1217, 1220 (10th Cir. 2000) (finding petitioner's *pro se* status and ignorance of the law are insufficient to support equitable tolling of the statute of limitations), *cert. denied,* 531 U.S. 1194, 121 S.Ct. 1195, 149 L.Ed.2d 110 (2001); *Felder v. Johnson,* 204 F.3d 168, 171-72 (5th Cir.) (ignorance of the law and *pro se* status do not constitute "rare and exceptional" circumstances justifying equitable tolling), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 622, 148 L.Ed.2d 532 (2000); *Terry v. Hurley,* 2014 WL 1660708, *2 (M.D. Ala. Mar. 10, 2014) ("[I]t is well settled that an inmate's lack of legal knowledge, the denial of access to a law library, his failure to understand legal principles and/or the inability to recognize potential claims for relief at an earlier juncture do not constitute extraordinary circumstances sufficient to warrant equitable tolling of the limitation period."); *Gardner v. Walker,* 2005 WL 1127137, *1 (M.D. Ga. May 7, 2005) ("'Ignorance of the law is no excuse; it is not a reason for equitable tolling.' . . . Here, Petitioner's Objection is without merit because his ignorance of AEDPA's limitations period fails to amount to 'extraordinary circumstance[s]' for equitable tolling purposes."); and *Teel v. Farrell,* 2006 WL 1148817, *4 (M.D. Ala. Apr. 28, 2006) ("[A]n inmate's status as a pro se litigant does not warrant equitable tolling."). Second, while Petitioner did not have an attorney when he filed his Rule 32 petition, as aforesaid, his family obviously retained Charles Wilson to prosecute his petition in the Mobile County Circuit, none of which really matters since there is no legal right to representation in collateral actions, *Whiddon v. Dugger,* 894 F.2d 1266, 1267 (11th Cir.), *cert. denied,* 498 U.S. 834, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990), and Livingston has not explained how not being able to afford an attorney to file his Rule 32 petition is related to his inability to timely file his federal habeas corpus petition. Third, as previously indicated, it is an utter falsehood that Petitioner did not have a copy of the trial transcript when he prepared and filed his Rule 32 petition in the Circuit Court of Mobile County, Alabama on December 17, 2003, as a cursory reading of his petition establishes, and such a falsehood, obviously, does not warrant equitable tolling. And, finally, Petitioner's "cursory assertions regarding the inadequacy of, or lack of access to, the prison law library are insufficient to warrant equitable tolling of the statute of limitations." *Carter v. Price,* 2014 WL (Continued)

*Dep't of Corrections,* 664 Fed.Appx. 770, 773 (11th Cir. Oct. 5, 2016) ("Even assuming the state court's failure to provide notice was an 'extraordinary circumstance' beyond Pollock's control, it does not support Pollock's claim the district court clearly erred in determining he failed to show he pursued his claims with due diligence.").

Finally, Livingston has not shown that he is entitled to have the untimeliness of his § 2254 petition excused based on actual innocence. In *McQuiggin v. Perkins*, 569 U.S. 383, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013), the Supreme Court specifically held that "actual [factual] innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations." *Id.* at ___, 133 S.Ct. at 1928. However, the Supreme Court also notably cautioned that "tenable actual-innocence gateway pleas are *rare*[.]" *Id.* (emphasis supplied). "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.*, quoting *Schlup v. Delo,* 513 U.S. 298, 329, 115 S.Ct. 851, 868, 130 L.Ed.2d 808 (1995) (other citation omitted). Here, of course, Livingston makes no actual

--------------------------------------------------

1017663, *3 (M.D. Ala. Mar. 14, 2014); *see also McKenzie v. United States,* 2009 WL 3836450, *5 (S.D. Fla. Nov. 16, 2009) ("The movant's conclusory allegations regarding insufficient access to a law library do not justify equitable tolling."); *Paulcin v. McDonough,* 259 Fed.Appx. 211, 213 (11th Cir. Dec. 13, 2007) ("Paulcin asserted only the conclusory allegation that he was denied access to the [law] library and his records, but failed to allege how his inability to obtain legal materials thwarted his efforts to file a timely federal proceeding."), *cert. denied,* 555 U.S. 1086, 129 S.Ct. 776, 172 L.Ed.2d 756 (2008); *see Miller v. Florida,* 307 Fed.Appx. 366, 368 (11th Cir. Jan. 13, 2009) ("[E]ven restricted access to a law library, lock-downs, and solitary confinement do not qualify as [] circumstances warranting equitable tolling."); *Cutts v. Jones,* 2009 WL 230091, *7 (M.D. Ala. Jan. 30, 2009) ("[N]either an alleged inadequate prison law library nor limited access thereto establishes extraordinary circumstances warranting equitable tolling of the limitation period.").

innocence argument because he has offered no new evidence establishing his actual (factual) innocence of attempted murder. Instead, petitioner simply contends that the victim's identification testimony was manufactured and that had his attorney allowed him to testify, and called other witnesses from the Harper Center and/or the Mobile Infirmary to testify about the assaultive/violent propensities of his grandfather, even a "blind man" (much less the jury) would have found him not guilty of the attempted murder of Cynthia Meinhardt. In other words, petitioner's claims/arguments do not support an actual (factual) innocence claim in accordance with *McQuiggin* because they rely on the evidence presented at Petitioner's trial (or evidence that could have been presented at his trial), not on any "new evidence." Thus, it is clear that petitioner cannot take advantage of the actual innocence gateway recognized in *McQuiggin*.[41]

In short, the undersigned concludes that nothing other than Livingston's own lack of due diligence is responsible for the untimeliness of the filing of the instant petition. This is not one of those rare cases in which principles of equitable tolling can save petitioner from AEDPA's one-year limitations period, nor has he established his actual innocence of the offense for which he was convicted by a jury of his peers. However, even assuming this Court was to take the prodigious and speculative leap of concluding that Petitioner is entitled to equitable tolling of the one-year limitations period for a period of just shy of twelve years, such conclusion would not entitle Petitioner to habeas

---

[41]   Indeed, the undersigned would stake the position that the only new evidence that would suffice in this matter to activate *McQuiggin*'s actual innocence gateway would be an affidavit from Meinhardt retracting her trial testimony and establishing that J.B. Livingston, not Petitioner, was her true assailant on March 7, 2002.

corpus relief since this Court is procedurally barred from reaching the merits of the claims Livingston has raised in his federal habeas corpus petition.

      **B.**    **Procedural Default Doctrine.**  In *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme Court stated that it would "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Id.* at 729, 111 S.Ct. at 2553-2554. This rule applies whether the state law ground is procedural or substantive. *Id.* at 729, 111 S.Ct. at 2554. The doctrine applies to bar federal habeas review when a state court declines to address a petitioner's federal claims because the petitioner fails to meet a state procedural requirement. *Id.* at 729-730, 111 S.Ct. at 2554; *see also Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (federal courts must honor legitimate state trial and appellate procedural rules when enforced by state courts and must decline to review on the merits claims that the state treats as barred absent a showing of cause for non-compliance with such rules and resulting prejudice); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.) ("Pursuant to the doctrine of procedural default, a state prisoner seeking federal habeas corpus relief, who fails to raise his federal constitution[al] claim in state court, or who attempts to raise it in a manner not permitted by state procedural rules is barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default."), *cert. denied sub nom. Alderman v. Thomas*, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994). "In these cases, the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730, 111 S.Ct. at 2554 (citations omitted).

The application of the independent and adequate state ground doctrine in the habeas context is grounded in concerns of federalism and comity. *Id.*

> Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

*Id.* at 730-731, 111 S.Ct. at 2554.

An additional consideration comes to the fore when the independent and adequate state ground supporting a petitioner's custody is a state procedural default.

*Id.* at 731, 111 S.Ct. at 2554.  The Supreme Court has long held

> that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims. (citations omitted) This exhaustion requirement is also grounded in principles of comity; in a federal system, the States should have the opportunity to address and correct alleged violations of state prisoners' federal rights.
>
> .    .    .
>
> [A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. A habeas petitioner who has defaulted his federal claims in state court meets the technical requirement for exhaustion; there are no state remedies any longer "available" to him.  (citations omitted) In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

*Id.* at 731, 732, 111 S.Ct. at 2554-2555, 2555.

In the habeas context, federal courts are to "presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law,

and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Id.* at 735, 111 S.Ct. at 2557 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-1041, 103 S.Ct. 3469, 3476-3477, 77 L.Ed.2d 1201 (1983)); *see Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."). In all other cases, the presumption is not applicable. *See Coleman*, 501 U.S. at 739, 111 S.Ct. at 2559. In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court held that the *Harris v. Reed* presumption is inapplicable to a claim that is never presented to the state courts. *Id.* at 299, 109 S.Ct. at 1069 ("The rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding."). Moreover, the presumption "looks through" unexplained orders to the last reasoned decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804, 111 S.Ct. 2590, 2595, 115 L.Ed.2d 706 (1991).

> Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.   If an earlier opinion "fairly appear[s] to rest primarily upon federal law," *Coleman*,[__ U.S., at __, 111 S.Ct., at 2559], we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place.   Similarly where . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

501 U.S. at 803, 111 S.Ct. at 2594. Also, the presumption may not be applied in cases in which the state court opinion did not, at a minimum, discuss the federal grounds at issue. *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993) ("*Coleman* and *Ylst* lead us to

conclude that we may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of this case. In fact, the most reasonable assumption is that had the state court ruled, it would have enforced the procedural bar."). Finally, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant, supra*, 22 F.3d at 1549.

When a petitioner has procedurally defaulted a claim, a federal court is barred from reaching the merits of that claim unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman, supra*, 501 U.S. at 750, 111 S.Ct. at 2565. The cause and prejudice standard applies "uniformly to all independent and adequate state procedural defaults." *Id.* at 750-751, 111 S.Ct. at 2565.

> In procedural default cases, the cause standard requires the petitioner to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in state court. Objective factors that constitute cause include interference by officials that makes compliance with the state's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally [i]neffective assistance of counsel is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default. Once the petitioner has established cause, he must show actual prejudice resulting from the errors of which he complains.

> Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.

*McCleskey v. Zant*, 499 U.S. 467, 493-494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991) (internal quotation marks and citations omitted).

In his answer, respondent asserts that all of petitioner's claims are procedurally defaulted under *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) due to Livingston's failure to "fairly present" these claims throughout "one complete round of the State's established appellate review process[,]" *id.* at 845, 119 S.Ct. at 1732 (*see* Doc. 12, at 19-22). *Compare McNair v. Campbell,* 416 F.3d 1291, 1302 & 1305 (11th Cir. 2005) ("Habeas petitioners generally cannot raise claims in federal court if those claims were not first exhausted in state court. . . . In order to be exhausted, a federal claim must be fairly presented to the state courts. . . . [I]n order to ensure that state courts have the first opportunity to hear all claims, federal courts 'have required a state prisoner to present the state courts with the ***same*** claim he urges upon the federal courts.' . . . It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar. . . . In such a situation, the Supreme Court has held that the petitioner has failed to properly exhaust his state court remedies and therefore has procedurally defaulted his claims. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999)."), *cert. denied,* 547 U.S. 1073, 126 S.Ct. 1828, 164 L.Ed.2d 522 (2006), *with Kelley v. Secretary for the Dep't of Corrections,* 377 F.3d 1317, 1344 & 1351 (11th Cir. 2004) ("[T]he prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief. For example, habeas petitioners may not present particular factual

instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts. . . . Dismissing a mixed petition is of little utility [] when the claims raised for the first time at the federal level can no longer be litigated on the merits in state court because they are procedurally barred. In such a case, requiring the petitioner to return to state court only to make a futile application for relief simply delays the federal courts' adjudication of his petition."), *cert. denied,* 545 U.S. 1149, 125 S.Ct. 2962, 162 L.Ed.2d 906 (2005).

Petitioner frankly admits that all of the claims he has raised in his federal petition are new claims, not exhausted in state court, and subject to default under *O'Sullivan v. Boerckel, supra,* but that he is "saved" by the exception that "'some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" (Doc. 14, at 15.) There can be no question but that the just-quoted language is directed to only one prong of the cause and prejudice exception to the procedural default doctrine, namely the cause prong, *see, e.g, McCleskey, supra*, 499 U.S. at 493-494, 111 S.Ct. at 1470, and Petitioner nowhere in his response makes any showing of actual prejudice as a result of the alleged violations of federal law (*see id.* at 16-18); therefore, this Court could legitimately conclude that the cause and prejudice exception to the procedural default doctrine is not applicable in this case. *See Macklin v. Singletary*, 24 F.3d 1307, 1313 (11th Cir. 1994) (in abuse of the writ case, appellate court suggests that habeas courts need perform no analysis when the petitioner fails to argue an exception to application of the doctrine), *cert. denied*, 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995). However, the undersigned does not chart this course and, instead, takes direct aim at Petitioner's cause argument, namely, that his

trial transcript/record on appeal was withheld from him for over 14 years, such that he could not raise the claims asserted in his federal petition until he received those records on an unidentified date in 2017 (*see* Doc. 14, at 16-18).

Petitioner's cause argument is a total fabrication. Indeed, Petitioner did not just "receive" a copy of his trial transcript/record on appeal sometime in 2017, he had a copy of the trial transcript at the time he filed his Rule 32 petition in the Circuit Court of Mobile County, Alabama on or about December 17, 2003 (and presumably has retained that copy of his trial transcript to date). As Petitioner himself recognizes (*see* Doc. 14, at 16), the record reflects that appellate counsel verified in his *Anders* brief that he forwarded to Livingston a copy of the record on appeal and a copy of the appellate brief (Doc. 12, Exhibit 3, at 28; *see also* Doc. 12, Exhibit 4, ORDER ("Counsel has also advised this Court that the appellant was served with a copy of the no-merit brief ad furnished with the appellant's copy of the record on appeal.")), and that Livingston received a copy of the record on appeal/trial transcript and had a copy of it in his possession when he filed his Rule 32 petition is made evident by Livingston's citations to specific portions of his trial transcript in his Rule 32 petition (*see, e.g.,* Doc. 12, Exhibit 9A, at 14-15 ("In the present case the State submitted into evidence a drawing (see) TR-73 at line 11 that states, 'MR. Deen, Judge, I assume she's gonna tie that up later with another witness, whoever drew it? Ms. Francez states, I am Judge. Mr. Deen States, 'That's fine[.] [I]f she's using it for illustration purposes, if somebody is going to say they drew it, I don't object to her showing it to the jury.[']"); *compare id. with* Doc. 12, Exhibit 1, T.T. 73 (same)). It is apparent, therefore, that Petitioner's

cause argument is due to be rejected because it is based on an utter falsehood,[42] it being clear that Livingston was fully equipped with the trial transcript to make all claims raised in his federal petition when he filed his Rule 32 petition in the Circuit Court of Mobile County in December of 2003.[43]

The fundamental miscarriage of justice/actual innocence exception does not apply in this case because Petitioner has not satisfied (nor, indeed, has he tried to satisfy in his response to the respondent's answer) the standard set forth in *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). That standard requires Livingston to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. at 2649-2650. To be credible, a

---

[42]      This Court need decline to reward purveyors of demonstrable falsehoods.

[43]      None of the claims Livingston has raised in his federal habeas corpus petition require anything beyond the contents of the trial transcript to inform and, in fact, the centerpiece of his federal petitioner, trial counsel's failure to call him as a witness, represents a claim that Petitioner could have asserted even had he not had a copy of the trial transcript when he filed his Rule 32 petition. After all, Petitioner was well aware of the fact that he did not testify in his own defense and there is nothing in the trial transcript that was needed by Livingston to make such a claim. Moreover, if Petitioner is to be believed, he was well aware of the factual "underpinnings" of many of the claims he seeks to raise in this federal habeas petition well before he received a copy of his trial transcript and filed his Rule 32 petition in state court in December of 2003. (*Compare* Doc. 8, Attached Letter to Glen Davidson dated May 16, 2003 (advising appellate counsel that he desired to raise numerous issues on appeal, including that his trial attorney was ineffective, he was denied the right to testify, a police detective slid a note under the door leading to the jury deliberation room, Cheryl Moore and other doctors and nurses attacked by J.B. Livingston should have been called to testify in his defense) *with id.,* Attached Letter to Jeff Deen dated April 8, 2003 (complaining to trial counsel that trial counsel "sold [him] out" by denying him the right to testify in his own defense, failing to call as witnesses in his defense Cheryl Moore and other doctors and nurses who were attacked by J.B. Livingston, failing to request a mistrial on the basis of a police detective sliding a note under the door of the jury deliberation room while the jury was deliberating his fate, etc.)). Thus, it is apparent to the undersigned that no objective factor external to the defense impeded Livingston's efforts to raise these claims in state court; Petitioner simply chose not to raise in the state courts of Alabama the claims he now seeks to raise in this Court. Therefore, this Court is procedurally barred from reaching the merits of the claims Petitioner has set forth in his federal habeas petition. *See O'Sullivan v. Boerckel, supra.*

claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995); *see also id.* at 327, 115 S.Ct. at 867 ("To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."). "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998) (citation omitted). Livingston simply has not come forward with any new reliable evidence—for example, a retraction of testimony from the victim—that establishes his actual factual innocence of the attempted murder of Cynthia Meinhardt for which he was convicted on April 2, 2003, his many conclusory protestations of innocence notwithstanding. Accordingly, this case is not one of those rare cases in which the actual innocence exception is applicable.

C.     **Certificate of Appealability.**     Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2254, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1).  A certificate of appealability may issue only where "the applicant has made a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2). Where, as here, a habeas petition is being denied on procedural grounds without reaching the merits of the underlying constitutional claims, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000); *see Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether  (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'"). Inasmuch as equitable tolling is an extraordinary remedy which the Eleventh Circuit has rarely granted, *see Diaz, supra*, 362 F.3d at 701 ("[T]his court has rejected most claims for equitable tolling."), and petitioner has defaulted the claims he wishes this Court to address pursuant to *O'Sullivan v. Boerckel, supra*, a reasonable jurist could not conclude either that this Court is in error in dismissing the instant petition or that Livingston should be allowed to proceed further, *Slack, supra*, 529 U.S. at 484, 120 S.Ct. at 1604 ("Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further.").

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If there is an

objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.  *Brightwell v. Patterson,* CA 11-0165-WS-C, Doc. 14 (Eleventh Circuit order denying petitioner's motions for a COA and to appeal IFP in a case in which this Court set out the foregoing procedure); *see also Castrejon v. United States,* 2011 WL 3241817, *20 (S.D. Ala. June 28, 2011) (providing for the same procedure), *report and recommendation adopted by* 2011 WL 3241580 (S.D. Ala. Jul. 29, 2011); *Griffin v. DeRosa,* 2010 WL 3943702, at *4 (N.D. Fla. Sept. 20, 2010) (providing for same procedure), *report and recommendation adopted sub nom. Griffin v. Butterworth,* 2010 WL 3943699 (N.D. Fla. Oct. 5, 2010).

## CONCLUSION

The Magistrate Judge again recommends that Michael Antonio Livingston's petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be dismissed as time-barred under § 2244(d). Alternatively, Petitioner is not entitled to any relief in this Court because he has procedurally defaulted his claims pursuant to *O'Sullivan v. Boerckel*. Petitioner is not entitled to a certificate of appealability and, therefore, he is not entitled to appeal *in forma pauperis*.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. GenLR 72(c)(1) & (2). The parties should note that under Eleventh

Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 27th day of October, 2017.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**